FILED & JUDGMENT ENTERED
David E. Weich

Mar 23 2010

Clerk, U.S. Bankruptcy Court
Western District of North Carolina

J. Craig Whitley
United States Bankruptcy Judge

UNITED STATES BANKRUPTCY COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
WILKESBORO DIVISION

| | | |
|---|---|---|
| In re: | ) | Case No. 08-51243 |
| | ) | Chapter 7 |
| **RONALD CREIGH HILL** | ) | |
| **SABRINA COLLINS HILL,** | ) | |
| | ) | |
| Debtors. | ) | |
| | ) | |
| **ANDRESEN & ARRONTE, PLLC** | ) | Adversary Proceeding No. |
| | ) | 09-05002 |
| Plaintiff | ) | |
| | ) | |
| vs. | ) | |
| | ) | |
| **RONALD CREIGH HILL** | ) | |
| **SABRINA COLLINS HILL** | ) | |
| | ) | |
| Defendant | ) | |

**MEMORANDUM ORDER**

A bench trial was held on January 21, 2010 in this §
523(a)(2) dischargeability action brought by Plaintiff Andresen
& Arronte, PLLC, ("the Firm"), against two of its clients,
Debtor/Defendants Ronald and Sabrina Hill (collectively "the
Hills"). The debt in question stems from the Firm's defense of
the Hills in a prepetition state court lawsuit. The Firm
maintains the Hills induced it to continue the representation

1

through false assurances of payment. The Firm believes its $47,258.51 debt should be deemed nondischargeable under 11 § 523(a)(2), as being occasioned by misrepresentations, false pretenses and fraud. The Hills deny making any false assertions.

At trial, the Hills moved for Directed Verdict after the Firm presented its case-in-chief. The Court deferred a ruling on that motion until after the Hills presented the Defendants' case. Now having heard all the evidence, the Court **GRANTS** Defendants' Motion for Directed Verdict as against Sabrina Hill but **DENIES** it as to Creigh Hill. As to a trial verdict, the Court **FINDS IN FAVOR OF DEFENDANT** Creigh Hill. As to both Debtors, the debts owed to the Firm are dischargeable.

## FINDINGS OF FACT

In July 2007, the Hills entered into a contract ("Sales Contract") to sell a one-half interest in their RE/MAX real estate business to Kelly Lake ("Lake"). Shortly after Lake made a $150,000 payment pursuant to the Sales Contract, Lake changed her mind and attempted to rescind the Sales Contract. Lake filed a lawsuit ("Lake action") against the Hills in Mecklenburg County, North Carolina alleging breach of contract in connection with the Sales Contract.

In November 2007, the Hills retained the Firm to defend the Lake action and to assert counterclaims on their behalf. After executing a written fee agreement, the Hills provided the Firm

with a non-refundable retainer and agreed to make payment for all subsequent legal services in accordance with the fee agreement. The Firm then commenced its representation of the Hills in the Lake action.

Shortly thereafter, two attorneys left the Firm to join a new law practice. The Firm's sole legal assistant ("Walle") abruptly resigned and also joined the new practice. When it was learned that Walle's new firm represented Lake in the Lake action, the Hills and the Firm were disturbed about the apparent conflict of interest, leading to actions in the state court seeking to disqualify Lake's attorneys.

During discussions between the Firm and Creigh Hill ("Creigh") regarding the conflict issue, the first indicia of the Hills' financial distress began to surface. On January 26, 2008, Creigh emailed the Firm to discuss litigation strategy and the conflict of interest matter. His email notes the financial strain that the Hills were experiencing, "We are troubled about the additional costs we may incur because of this incident and additional motions that will have to be filed...We have been concerned of the cost of these motions and overall strategy of the case as mentioned several times before...we would like to stall this as long and as inexpensively as possible." (Def.'s Tr. Ex. 1.)

Even after the conflict of interest issue was resolved, Creigh kept in close contact with the Firm regarding the litigation, not only as to strategy, but also as to its costs, the Hills' financial predicament and how Creigh hoped to pay the Firm. On March 18, 2008, Creigh emailed the Firm with a payment update for the Hills' outstanding legal bill. Creigh told the Firm that he was refinancing his home to help with legal fees. (Def.'s Tr. Ex. 2.) Shortly thereafter, on April 7, 2008, Creigh emailed the Firm to advise that his home appraisal was being completed. His email clearly states that "[the refinancing] is the only option I have. I understand if you need to hold up on the case until then." (Def.'s Tr. Ex. 3.) The Firm, content with Creigh's hope of refinancing, continued its representation.

Creigh updated the Firm about his decreasing payment ability and consequently sought to slow down the litigation with his May 13, 2008 email, "The appraisers are being extremely conservative on the value of my home. I will not be able to refinance because of this...**I understand if you need to withdrawal as my counsel until I can get you paid**. I mentioned to [the Firm's paralegal] that we needed to delay these proceedings as much as possible to allow me time to earn the funds to pay as we go. I have no choice. Is there any way we can delay everything for at least another month? This would

allow me more time to seek other options." (Def.'s Tr. Ex. 4)(emphasis in original).

When the Firm replied that postponement of the depositions in question was not possible (Def.'s Tr. Ex. 5.), Creigh reiterated the Hills' financial predicament. His May 14, 2008 email states, "We have no choice...I need additional time to work to pay your bill." *Id.* Despite the Hills' mounting legal bill[1], the Firm continued the representation.

On August 15, 2008, Creigh emailed the Firm asking to settle the Lake action to avoid the cost of a trial. (Def.'s Tr. Ex. 6.) Ken Andressen, principal of the Firm, responded, "I understand that you don't want to incur more expense by going through with a trial, but this is not like checking out of a hotel room where you can decide that you simply don't want to stay anymore. If you want to cave into her demand, you can get out of a trial...we have made the counter offer. Now we need to see if she will accept it. In the meantime, I have to continue preparing for a trial." *Id.*

Creigh and the Firm elected to go forward. Afterward, Creigh emailed the Firm on September 29, 2008, again stating his hope to pay them: "I will work on funds this week to get a payment into [the Firm]." (Pl.'s Tr. Ex. 9.)

---

[1] A chart of the progression of legal fees is located at the close of the findings of fact.

On October 21, 2008 (notably the same day Creigh took his pre-bankruptcy credit counseling), Creigh emailed the Firm again addressing both the Hill's outstanding bill and their financial infirmities, "I have been working on every option to raise money to pay you...At this point I'm going to lose my home due to foreclosure, so there goes my equity...What options do I have if any with you?" (Def.'s Tr. Ex. 7.)   The Firm responded by proposing that Creigh and Sabrina sign a promissory note and give it a deed of trust on the Hills' house. *Id.* "[The Firm] know[s] that it is mortgaged to the hilt and that [the Firm] probably will not see a dime if the property is foreclosed on; but, still, it is something." *Id.* The record does not reveal whether Creigh or Sabrina did in fact sign a promissory note and/or sign over the deed of trust to the Hills' house.

Meanwhile settlement negotiations were progressing in the Lake action. The Firm sent Creigh an email on October 28, 2008 asking him to review a list of business assets proposed to be divided between the Hills and Lake.   (Def.'s Tr. Ex. 8.) A settlement document was executed by the Hills on November 10, 2008. (Pl.'s Tr. Ex. 11.)

Unbeknownst to the Firm, during this time period, the Hills' home had been under attack by creditors.  First, on July 8, 2008, the Defendants' mortgage lender recorded an Appointment and Substitution of Trustee in Iredell County. (Pl.'s Tr. Ex.

6

14.)  Although the foreclosure sale of the home would not occur until June of the following year,[2] the property was in jeopardy from this point forward. Second, at some point, Branch Bank & Trust Co. obtained a judgment against Creigh and initiated an execution. In September 2008, Creigh and/or Sabrina Hill claimed exemptions in the house as against BB&T's judgment lien. (Pl.'s Tr. Ex. 13.)

On the verge of having their home sold, the Hills filed for bankruptcy protection under Chapter 7 on October 31, 2008.  The Firm did not learn of the Hills' bankruptcy until after it was filed, on November 10, 2008.  (Def.'s Tr. Ex. 9.) Ironically, the Lake action settled eleven (11) days after bankruptcy, on November 11, 2008, with an agreed division of the business assets.[3]

The Hills' bankruptcy filing left the Firm with a large unpaid bill.  The chart below summarizes the progression of these legal fees over the relevant time periods.

| DATE | BALANCE OWED |
|------|--------------|
| January 30, 2008 | $10,368.75 |
| March 31, 2008 | $19,630.00 |

---

[2] That foreclosure was stayed by the Hills' bankruptcy, but was finally completed on July 9, 2009, when a Substitute Trustee's Deed was recorded in Iredell County. (Pl.'s Tr. Ex. 15.)

[3] Because the settlement was reached after bankruptcy, technically, consent of the Trustee and court approval were required to make the settlement effective.

| | |
|---|---|
| May 30, 2008 | $28,905.00 |
| August 15, 2008 | $45,731.50 |
| October 30, 2008 | $45,978.51 |
| November 6, 2008 | $46,168.51 |
| November 8, 2008 | $47,068.51 |
| November 11, 2008 | $47,258.51 |

(Pl.'s Tr. Ex. 2.)

## LEGAL POSITIONS OF THE PARTIES

The Firm claims the Hills' debt for legal services is not dischargeable under § 523(a)(2) because promises of future payment on the debt were repeatedly made and, thereby, induced the firm to continue its representation. The Firm asserts that promises of payment were made knowing that such payments could not and would not be made. Specifically, the Firm maintains that the Debtors' statements amount to misrepresentations, false pretenses and/or actual fraud pursuant to § 523(a)(2)(A).

The Hills maintain that Creigh's statements were not false misrepresentations but were instead truthful expressions of the Hills' intentions to pay the Firm when they could. The Hills note that throughout the representation, Creigh kept the Firm apprised of the Hills' financial struggles. Consequently, not only was there no intention to mislead by the Hills, but also

the Firm could not have relied on any such statement to its detriment.

Additionally, in their Motion for Directed Verdict, and as to Sabrina Hill ("Sabrina"), the Hills assert that the Firm presented no evidence showing any statement, let alone a misrepresentation, by Sabrina. Thus, the action should be dismissed as to her and her liability discharged. While Sabrina admittedly made no such promises, the Firm attributes all statements made by Creigh to Sabrina under an agency theory.

Lastly, the Firm maintains that the statements made by Creigh do not qualify as a "statement respecting the debtor's...financial condition" under § 523(a)(2)(A). The Hills argue that regardless of whether the statements "respect[] the debtor's...financial condition," the Firm has failed to prove by a preponderance of evidence that the elements of § 523(a)(2)(A) or (a)(2)(B).

### CONCLUSIONS OF LAW

**A.    SABRINA COLLINS HILL**

Directed verdict is appropriate when the evidence is such, without weighing the credibility of witnesses, that there is only one conclusion that reasonable jurors could have reached. *Decker v. UNUM Provident Corp.*, 87 Fed. Appx. 304, 308 (4th Cir. 2004). "[A]n issue can only be submitted to a jury when it is supported by substantial evidence that shows a probability and

not mere possibility of proof." *Id.* (citing *E. Auto Distribs., Inc. v Peugeot Motors*, 795 F.2d 329, 335 (4th Cir. 1986)).

Here, the Firm has offered no proof of any misrepresentation made by Sabrina specifically. Instead, the Firm seeks to impute Creigh's alleged misrepresentations to Sabrina as her agent, entirely based on the fact that they are married.

An agency relationship exists when a contract or conduct establishes that an entity or individual is controlled by a principal and works for the benefit of the principal. *Smith v. United Recovery, Inc.*, 222 Fed. Appx. 248, *2 (4th Cir. 2007) (unpublished opinion) (citing 1 *Michie's Jurisprudence*, Agency § 2). Within the confines of agency theory, the Fourth Circuit has affirmed that a wife is not the agent of her husband strictly by force of the marital relationship. *Pioneer Savings Bank, Inc. v. Huang (In re* Tara of North Hills)*, 116 B.R. 455, 462 (E.D.N.C. 1989), *aff'd*, 1990 WL 77088 (4th Cir. 1990). Instead, the Fourth Circuit believes the mutual confidence associated with such relationship is relevant to the issue of agency. *Id.*

In *Tara of North Hills*, the Fourth Circuit looked at whether a wife acted not only on her own behalf but also as an agent for her husband when she signed a consent order. *Id.* The debtor, Tara of North Hills, was a North Carolina general partnership that owned an apartment complex. *Id.* at 457. Tara's

three (3) general partners were Dr. Huang, Mrs. Huang, and Mr. Avent. *Id.* at 458.

Avent filed an involuntary petition against the partnership, forcing Tara into Chapter 11.  *Id.* The Huangs sought to dismiss the case. While their motion was pending, a creditor filed its own motions seeking relief from stay, adequate protection and restriction of cash collateral use.  *Id.* The parties then negotiated an agreed appointment of a Chapter 11 trustee. *Id.* Their agreement was memorialized in a written consent order.  *Id.* at 458-49.

Once the other parties signed the consent order, the Huangs inserted additional language into the order and signed the consent order.  *Id.* at 459.  After Mrs. Huang was informed that the additional language had to be striken, Mrs. Huang agreed to strike the additional language and purportedly signed the consent order in its original form for herself and her husband. *Id.* at 460-61.

A year and a half later, the Huangs moved to set aside the consent order, arguing that while Mrs. Huang may have consented to the amended order for herself, there was no evidence that she was authorized to act as the agent for her husband. *Id.* at 458-62.

The district court affirmed the findings of facts and conclusions of law found by the bankruptcy judge and held based

upon the strong factual record presented at the bankruptcy court's hearing on the matter that Mrs. Huang acted on behalf of both herself and her husband. That evidence demonstrated that both Huangs were active partners in the partnership; Mrs. Huang had previously acted as her husband's agent in conjunction with partnership business; and that prior to signing the amended consent order Mrs. Huang had spoken to a person on the telephone that she identified as her husband. *See id.* On appeal, the Fourth Circuit affirmed the reasoning of the district court. *Pioneer Savings Bank, Inc. v. Huang* (*In re* Tara of North Hills)*, 904 F.2d 701, 701 (4th Cir. 1990).

Several other courts have also held that, "in the case of husband-and-wife debtors, the marital relationship alone is not enough to impute one spouse's fraud to the other for nondischargeability purposes." *Tower Credit, Inc. v. Gauthier* (*In re* Gauthier), 2009 WL 3378251, at *2 (5th Cir. 2009) (unpublished opinion)(citing *Allison v. Roberts* (*In re* Allison), 960 F.2d 481, 485-86 (5th Cir. 1992)). *See also Boyd v. Loignon* (*In re* Loignon), 308 B.R. 243, 250 (Bankr. M.D.N.C. 2004) (finding no evidence of a business relationship between defendants and "marital status alone does not create an agency relationship")(quoting *In re* Tsurukawa, 258 B.R. 192, 198 (9th Cir. BAP 2001)).

For example, In *Tower Credit*, a creditor brought a dischargeability objection against both husband and wife debtors, alleging fraud by the husband. *Id.* at *1. Specifically, Tower Credit alleged that the husband made fraudulent misrepresentations on his application for a loan. However, Tower Credit sought to impute the husband's alleged fraud to the wife solely on the basis of their marital relationship. *Id.* The court found no suggestion that the wife had any knowledge or involvement in the husband's alleged fraud, and, therefore, granted the debtors' motion to dismiss as to the wife. *Id.* at *2-3.

The facts of the present case are quite similar to those appearing in the *Tower Credit* case. Here, the Firm has offered no proof that Sabrina had any involvement with the email statements made by Creigh (e.g. evidence of discussions between Creigh and Sabrina regarding the email communication between Creigh and the Firm or evidence of Sabrina's consent to such statements by Creigh on her behalf). Nor has the Firm established that Sabrina had any knowledge of these statements before or even after their dissemination. Consequently, this Court concludes that Creigh was not acting as Sabrina's agent when he sent the Firm these emails. Thus, the Court **GRANTS** the Hills' Directed Verdict Motion in favor of Sabrina Hill.

B.   RONALD CREIGH HILL

Turning to the Hills' Motion for Directed Verdict, as to Creigh, the Court finds that evidence offered by the Firm does not lead to only one conclusion that reasonable jurors could have reached.   Therefore, the Hills' Directed Verdict Motion as to Creigh Hill is **DENIED.**

As to the Firm's § 523(a)(2)(A) and § 523(a)(2)(B) claims, the Court will discuss each claim in turn.

1. <u>§ 523(a)(2)(A) – Debts for obtaining money, property, or services by false pretenses, misrepresentations, or actual fraud</u>

Section 523(a)(2)(A) of the Code states in part,

A discharge ... of this title does not discharge an individual debtor from any debt –
    (2) for money, property, services..., to the extent obtained by –
    (A) false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition. 11 U.S.C. §523(a)(2)(A).

As an initial matter, the parties dispute whether Creigh's emails qualify as "statement[s] respecting the debtor's ... financial condition" within the meaning of subpart (A). The phrase "respecting the debtor's ...financial condition" is not defined in the Bankruptcy Code nor is the term "financial condition," and the courts are sharply divided on the proper scope of the term.   4 *Collier on Bankruptcy*, ¶ 523.08[2][c] (16th ed. rev. 2009). Some courts hold that the term only refers to the debtor's overall financial condition, such as solvency or

14

net worth. *Id.* *O*ther courts use the term in a broader sense
and conclude that factual representations about asset ownership
or the non-existence of an encumbrance on an asset also
constitute "financial condition." *Id*.

The scope of "financial condition" is a question of first
impression in this district. However, such an analysis may not
be necessary in the present case if the other elements of §
523(a)(2) are not met. Therefore, the Court elects to address
the other elements of § 523(a)(2) first, and if the standard of
proof is satisfied, the Court will address the "financial
condition" issue.

A.   *Fraudulent Misrepresentation*

In order to have Creigh's liability deemed nondischargeable
under § 523(a)(2)(A), the Firm must establish that the debt was
incurred through:

    (1)  a fraudulent misrepresentation;
    (2)  which induced the Firm to act or refrain from acting;
    (3)  which caused harm to the Firm; and
    (4)  upon which the Firm justifiably relied.

*See Foley & Lardner v. Biondo* (*In re* Biondo), 180 F.3d 126, 134
(4th Cir. 1999). As the party challenging the dischargeability
of debt, the Firm has the burden of establishing each of the
foregoing elements by a preponderance of evidence. *See Grogan
v. Garner*, 498 U.S. 279, 291 (1991).

Turning to the first element, fraudulent misrepresentation,
this element is satisfied if the debtor's representation was

15

known to be false or recklessly made without knowing whether it was true or false. *Boyuka v. White* (*In re* White), 128 Fed. Appx., 994, at *3 (4th cir. 2005) (unpublished opinion)(citing *In re* Woolley, 145 B.R. 830, 834 (Bankr. E.D. Va. 1991)). And, a debtor's misstatement of intention is only "fraudulent if he does not have that intention at the time he makes the representation." *Palmacci v. Umpierrez*, 121 F.3d 781, 786 (1st Cir. 1997) (quoting Restatement (Second) of Torts § 530(1) (1976)).

However, "a promise or declaration, standing alone, is insufficient to support a claim under § 523(a)(2)(A), because a promise to perform some act in the future, without more, does not constitute a representation for purposes of § 523(a)(2)(A)." *Riddle Farm Equi. V. Boles* (*In re* Boles)(Ad. Pro. No. 04-6027)(Bankr. M.D.N.C. 2005)(unpublished) (citing *Allison v. Roberts* (*In re* Allison), 960 F.2d 481, 484 (5th Cir. 1992)("[A] promise to perform acts in the future is not considered a qualifying misrepresentation merely because the promise subsequently is breached.") Finally, a breach of contract, even an intentional breach, is not a fraud as contemplated by § 523(a)(2)(A). *See Strum v. Exxon Co.*, 15 F.3d 327, 331 (4th Cir. 1994).

Here, the Court concludes that Creigh's statements up until the date of his bankruptcy credit counseling do not qualify as

misrepresentations.    Creigh's    emails    illustrate    a    client
communicating about hope for future payment at an unspecified
later date.    The record fails to prove that Creigh never
intended to pay for legal services at the time he made any of
those promises.    Rather, Creigh's emails suggest that he had
every intention of paying for the Firm's legal services once he
acquired a means of payment. Creigh's belief (that he would be
able to pay the firm) may have been overly optimistic, but such
optimism is common among people facing financial difficulty.
However unrealistic, Creigh's intention appears earnestly held.

In any event, Creigh was forthright with the Firm about his
lack of present resources and his need to utilize other options
(more work hours, refinancing of his house, etc.) to pay the
Firm's bill. Therefore, the Firm has not satisfied its burden of
proof on the first element required under § 523(a)(2)(A) for the
majority of the Hills' outstanding debt.

A separate issue to assess is whether the Hills' failure to
apprise the Firm about the Hills' impending bankruptcy (after
receiving credit counseling) constitutes misrepresentations
under § 523(a)(2)(A). In an unpublished opinion decided in 2009,
the Fourth Circuit affirmed a bankruptcy court's finding that a
debtor's deliberate nondisclosure of a second mortgage while
attempting to obtain a bank loan was "clinching proof that [the
debtor] misled the bank and that [the debtor] deliberately

furnished a stale financial disclosure and a stale title abstract which [the debtor] knew did not reflect the [previous] Loan and mortgage." *Colombo Bank v. Sharp* (*In re* Sharp), 340 Fed. Appx. 899, 903 (4th Cir. 2009). The misrepresentation, however, standing alone was not enough to warrant nondischargeability under § 523(a)(2)(A), because this pre-funding nondisclosure was not material. *Id.* Rather, the evidence showed that the bank was "hot" to make the loan and the bank's loss was essentially caused by the parties' shared mistaken evaluations of the debtor's ability to repay the loan from income and/or the value of his business and the value of properties listed as collateral. *Id.*

Under *Sharp*, nondisclosure of the Hills' bankruptcy counseling to the Firm could qualify as a deliberate act of nondisclosure in an attempt to mislead. At least in theory,[4] the Hills could have sent an email to the Firm on October 21, 2008, advising that they had taken a credit-counseling course preparatory to filing bankruptcy. However, the Firm fails to cite, and the Court cannot find, any authority that imposes a duty on the Hills to inform the Firm that he was contemplating bankruptcy.

And even if such a duty were to exist, such nondisclosure pales when compared to the *Sharp* facts to the point of

---

[4] In twenty-five (25) years of involvement in bankruptcy cases, the undersigned can recall no circumstance where a debtor ever made such announcement to a creditor.

insignificance. If the Hills' failed to mention the counseling session, on the very same day he sent the Firm an email disclosing a much more significant financial calamity, the loss of the family home through foreclosure.

Like the bank in *Sharp*, the Firm was "hot" to see the litigation through, likely because the Hills counterclaims provided the Firm its best chance of being paid. This attitude is reflected in Andresen's email statement that, "I'd rather try a case than eat." *See* (Def.'s Tr. Ex. 6.)

In toto, the facts presented are insufficient to demonstrate a deliberate misrepresentation by concealment of material financial information to the Firm. Therefore, the Court concludes that the Hills' nonstatement concerning the post credit counseling do not qualify as misrepresentations under § 523(a)(2)(A).[5]

For sake of completion, the Court will address the remaining elements of § 523(a)(2) and the remaining claim under § 523(a)(2)(B). The second element required for a nondischargeable debt under § 523(a)(2)(A) is whether the Firm was induced by Creigh's representations to either act or refrain from acting. Again, the Court concludes that Creigh's statements were merely promises to pay at some point in the future when funds became available and not knowingly false

---

[5] Even if this was a misrepresentation by omission, at most, only the fees incurred after this point would be nondischargeable

19

statements intended to induce the Firm to continue representation.

Third, the element of causation is satisfied because the Firm did incur legal costs as documented by its billing statement. (P's Tr. Ex. 2.)

The final element is whether the Firm justifiably relied upon Creigh's statements concerning payments. To satisfy the justifiable reliance requirement, the creditor must prove it actually relied upon the debtor's misrepresentations. *In re Sharp*, 340 Fed. Appx. at 907 (citing *Field v. Mans*, 516 U.S. 59, 68 (1995)). Once the creditor establishes actual reliance, the creditor is then obliged to demonstrate that such reliance was justified. *Id.*

Justifiable reliance is a minimal, subjective standard that encompasses "a matter of the qualities and characteristics of the particular plaintiff, and the circumstances of the particular case, rather than of the application of a community standard of conduct to all cases." *See Field*, 516 U.S. at 71 (citing Restatement of Torts (Second) § 545A, cmt. B(1976)).

Although, the justifiable reliance element does not typically give rise to a duty to investigate, a creditor is not entitled to "blindly rel[y] upon a misrepresentation the falsity of which would be patent to him if he had utilized his opportunity to make a cursory examination or investigation. *In*

*re* Sharp, 340 Fed. Appx. at 906-07 (citing *Field*, 516 U.S. at
71).  "A duty to investigate can arise when the surrounding
circumstances give red flags that merit further investigation;
this analysis turns on 'an individual standard of the
[creditor's] own capacity and the knowledge which he has.'" *In
re* Sharp, 340 Fed. Appx. at 906-07 (citing *Field*, 516 U.S. at
72).

Here, the Firm argues that it justifiably relied upon
Creigh's statements of payment.  The Court finds otherwise.  The
Firm was a sophisticated party that was told on a regular basis
by a client that its prospects for payments were continuing to
diminish.  Creigh even went so far as to ask the Firm whether it
would withdraw due to the Hills' lack of financial resources.
Despite these obvious warning flags, the Firm continued its
representation and thereby gambled future services against the
prospect of being paid (either directly or through a litigation
recovery).  Thus, the Court finds that the Firm failed to
establish all the necessary elements required under §
523(a)(2)(A).

B.   *Actual Fraud*

The Firm alternatively claims that the Hills' statements
(and nonstatements) and failure to pay its bills constitute an
actual fraud under § 523(a)(2)(A).  "[A] creditor's proof of
actual fraud under subsection (2)(A) requires satisfaction of

21

the elements of common law fraud: '(1) false representation, (2) knowledge that the misrepresentation was false, (3) intent to deceive, (4) justifiable reliance on the representation, and (5) proximate cause of damages.'" *In re* Sharp, 340 Fed. Appx. at 901 (citing *Nunnery v. Rountree* (*In re* Roundtree), 478 F.3d 215, 218 (4th Cir. 2007)).

As previously discussed, the Firm established proximate cause of damages but has failed to establish either a false misrepresentation or justifiable reliance. However, again in order to complete the record, the Court will address the remaining element of intent. The intent requirement for actual fraud parallels the knowledge requirement for misrepresentation- "A false representation made under circumstances where [the maker] should have known of the falsity is one made with reckless disregard for the truth." *See Medlock v. Meahyen* (*In re* Meahyen), 422 B.R. 192, 202 (Bankr. D. Minn. 2010) (citing *The Merchants Nat'l Bank of Winona v. Moen* (*In re* Moen), 238 B.R. 785 (8th Cir. 1999). Further, the Restatement (Second) of Torts states, "[a] misrepresentation is fraudulent if the maker (a) knows or believes that the matter is not as he represents it to be, (b) does not have the confidence in the accuracy of the representation that he states or implies, or (c) knows that he does not have the basis for his representation that he states or implies." *Id.* (Citing Rest. (2d) Torts § 526 (1977)).

For the reasons outlined above, the Court finds that, at the time of each statement, Creigh did not believe or know that he would be unable to make a future payment after benefiting from continued legal services. As discussed previously, Creigh's statements are indicative of an individual attempting to keep his head afloat while his financial prospects continued to sink. His statements to the Firm are frank disclosures of his family's financial predicament and its affect on the Firm. Thus, the Firm has failed to prove by a preponderance of evidence that Creigh manifested the proper intent as required by § 523(a)(2)(A).

   C.   *Respecting the Debtor's Financial Condition*

Turning to the final element required under § 523(a)(2)(A), "respecting the debtor's...financial condition," the Court elects not to address the scope of the phrase and specifically the issue of whether Creigh's statements qualify as "a statement respecting the debtor's...financial condition." As previously mentioned, the phrase is ambiguously written in the Code, causing various interpretations among bankruptcy courts. Since the Firm has not met its burden of proof of establishing the other elements of § 523(a)(2)(A), the Court elects to reserve interpretation of the phrase to another day.

2. <u>§ 523(a)(2)(B) – Debts for obtaining money, property, services by use of a false financial statement</u>

Addressing the Firm's final claim under § 523(a)(2)(B), the Court also concludes the Firm failed to meet its burden of proof on this claim as well.  A creditor must prove by a preponderance of the evidence that the debt was obtained by the use of a statement:

(1)  in writing;

(2)  that is materially false;

(3)  respecting the debtor's or an insider's financial condition;

(4)  on which the creditor to whom the debtor is liable for money, property, services or credit reasonably relied;

(5)  that the debtor caused to be made or published with intent to decide. 11 U.S.C. §523(a)(2)(B).

Ignoring for the moment those elements of subpart (B) for which courts have reached differing interpretations (e.g. statement in writing and respecting a debtor's financial condition), the first element, whether a statement is materially false, is satisfied if the statement paints a substantially untruthful picture of a financial condition by misrepresenting information of the type which would normally affect the decision to grant credit. *Cmty. Bank of Homewood-Flossmoor v. Bailey* (*In re* Bailey), 145 B.R. 919, 930 (Bankr. N.D. Ill. 1992). For reasons already stated, this Court concludes that Creigh's

statements do not paint a substantially untruthful picture of his financial condition.

Next, the reasonable reliance standard under § 523(a)(2)(B) imposes a more demanding standard than the justifiable reliance under § 523(a)(2)(A). *See Field*, 516 U.S. at 61. Just like justifiable reliance, reasonable reliance also requires actual reliance. *Id.* at 68. In order to evaluate reasonable reliance, a court must objectively assess the circumstances to determine whether the creditor exercised "that degree of care which would be exercised by a reasonably cautious person in the same business transaction under similar circumstances." *In re* Sharp, 340 Fed. Appx. at 908 (citing *Ins. Co. of N. Am. v. Cohn* (*In re Cohn*), 54 F.3d 1108, 1117 (3d Cir. 1995)).

Here, the Firm did not exercise the degree of care that a reasonably cautious person or law firm would exercise. The Firm was repeatedly apprised of the Hills' precarious financial position and was aware of their likely inability to pay the outstanding legal bill. The Firm overlooks the reality that it knew of Hills' financial despair and yet continued to perform work. The only reasonable interpretation of these contradictory facts is that the Firm believed that its best prospect for payment was to see the Lake action through and be repaid out of any recovery.

The Firm's reliance was neither justifiable nor reasonable. With each of Creigh's emails asking for more time to earn money or seeking withdrawal due to nonpayment, the Firm was shown a red flag, which in each case it disregarded. Clearly, the Firm closed its eyes to the Hills' inability to pay. The Firm failed to establish reasonable reliance pursuant to § 523(a)(2)(B).

With two of the elements of § 523(a)(2)(B) absent, there is no need to address the more controversial issues of (1) whether Creigh's statements via email would satisfy the "statement in writing" criteria and (2) whether Creigh's statements qualify as "statements respecting a debtor's financial condition." Those issues are reserved for another day.

Therefore, the Court Orders:

(1)   Defendants' Motion for Directed Verdict as to Sabrina Collins Hill is **GRANTED**;

(2)   Defendants' Motion for Directed Verdict as to Ronald Creigh Hill is **DENIED**; and

(3)   The Defendants' debt to Plaintiff is deemed **DISCHARGEABLE.**

**SO ORDERED.**

**This Order has been signed electronically.**     **United States Bankruptcy Court**
**The Judge's signature and Court's seal**
**appear at the top of the Order.**